1    LATHAM & WATKINS LLP
     Mark A. Flagel (State Bar No. 110635)
2    Bob Steinberg (State Bar No. 126407)
     Franklin D. Kang (State Bar No. 192314)
3    355 South Grand Avenue
     Los Angeles, California  90071-1560
4    Telephone:  (213) 485-1234
     Facsimile:  (213) 891-8763

6    LATHAM & WATKINS LLP
     Dean G. Dunlavey (State Bar No. 115530)
     650 Town Center Drive, 20th Floor
7    Costa Mesa, CA 92626-1925
     Telephone:  (714) 755-8260
8    Facsimile:  (714) 755-8290

9    Attorneys for Plaintiff
     MONOLITHIC POWER SYSTEMS, INC.

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
Scott R. Mosko (State Bar No. 106070)
Stanford Research Park
3300 Hillview Avenue
Palo Alto, California 94304-1203
Telephone:  (650) 849-6600
Facsimile:  (650) 849-6666

Attorneys for Plaintiff
MONOLITHIC POWER SYSTEMS, INC.
and Counterclaim-Defendants
ASUSTEK COMPUTER INC. and ASUS
COMPUTER INTERNATIONAL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>O2 MICRO INTERNATIONAL LIMITED,<br><br>Defendant.<br><br>_____<br><br>O2 MICRO INTERNATIONAL LIMITED,<br><br>Counterclaimant,<br><br>v.<br><br>MONOLITHIC POWER SYSTEMS, INC.,<br>ASUSTEK COMPUTER INC., ASUS<br>COMPUTER INTERNATIONAL<br>AMERICA, BENQ CORPORATION, AND<br>BENQ AMERICA CORP.,<br><br>Counterclaim-Defendants. | Case No. C 08-4567 CW<br><br>**MONOLITHIC POWER SYSTEMS AND<br>ASUSTEK ENTITIES':**<br><br>**(1) RESPONSIVE CLAIM CONSTRUCTION<br>BRIEF; (2) MOTION FOR SUMMARY<br>JUDGMENT OF NON-INFRINGEMENT;<br>(3) OPPOSITION TO O2 MICRO'S MOTION<br>FOR SUMMARY JUDGMENT REGARDING<br>INVENTION DATE OF THE '382 PATENT;<br>(4) CROSS-MOTION FOR SUMMARY<br>JUDGMENT OF INVALIDITY; (5) MOTION<br>FOR SUMMARY JUDGMENT OF NO<br>CONCEPTION OR DILIGENCE PRIOR TO<br>JULY 1999; AND (6) MOTION FOR<br>SUMMARY JUDGMENT OF NO WILLFUL<br>INFRINGEMENT AND NO ENHANCED<br>DAMAGES**<br><br>DATE:    December 10, 2009<br>TIME:    2:00 p.m.<br>ROOM:  Courtroom 2, 4th Floor<br>JUDGE:  Hon. Claudia Wilken |

# TABLE OF CONTENTS

Page

I. CLAIM CONSTRUCTION ........................................................................................ 1

    A. Legal Standards Governing Claim Construction ................................................. 1

    B. Asserted Claims and Agreed-Upon Claim Constructions ..................................... 1

    C. Disputed Claim Constructions ............................................................................. 2

II. MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT OF NON-INFRINGEMENT, UNDER EITHER PARTIES' PROPOSED CONSTRUCTION OF "TIMER CIRCUIT" .............................................................. 10

    A. O2 Micro Has Not Alleged Infringement Under MPS/ASUSTeK's Proposed Constructions ..................................................................................... 10

    B. MPS and ASUSTeK Are Entitled to Summary Judgment of Non-Infringement Under O2 Micro's Proposed Constructions .................................. 11

III. OPPOSITION TO O2 MICRO MOTION FOR SUMMARY JUDGMENT REGARDING INVENTION DATE OF THE '382 PATENT ...................................... 15

    A. Introduction and Summary of Argument ........................................................... 15

    B. The Invalid "Inventions" Claimed in U.S. Patent No. 6,396,722 Were Different from the Claimed Inventions of the '382 Patent ........................ 15

    C. The Court's Decision to Admit Into Evidence the "Feb., 18, 1998" Schematics in the 2007 Trial Did Not Represent a Finding Of Authenticity ....................................................................................................... 16

    D. To the Extent that the Jury Based Its Obviousness and On-Sale Bar Verdicts On MPS's Development of the MP1010, Those Verdicts Establish that the Jury Rejected Dr. Lin's Claimed February 1998 Conception Date .................................................................................................. 17

    E. Precluding MPS from Challenging a Conception Date that Rests on False Testimony Followed by a Protracted Cover-Up Would Be Manifestly Unfair ................................................................................................ 18

IV. IF THE PRINCIPLES OF COLLATERAL ESTOPPEL ARE HELD TO BE APPLICABLE HERE, MPS AND ASUSTEK CROSS-MOVE FOR SUMMARY JUDGMENT THAT ALL OF THE ASSERTED CLAIMS OF THE '382 PATENT ARE INVALID ....................................................................... 19

V. MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT THAT O2 MICRO IS NOT ENTITLED TO AN INVENTION DATE PRIOR TO THE JULY 22, 1999 FILING OF ITS PROVISIONAL PATENT APPLICATION ........................................................................................ 19

    A. Legal Standards Governing Conception and Reduction to Practice ................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.      There Is No Evidence that Lin Conceived of His Invention Before July 1999 ........................................................................................ 22

VI.   MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT AND NO ENHANCED DAMAGES ............................................................................................ 24

VII.   CONCLUSION ............................................................................................ 25

1

## TABLE OF AUTHORITIES

2

**Page**

3

### CASES

4 *Allen Eng'g Corp. v. Bartell Indus., Inc.,*
299 F.3d 1336 (Fed. Cir. 2002)..............................................................3, 7

5
*Burroughs Wellcome Co. v. Barr Laboratories, Inc.,*
6 40 F.3d 1223 (Fed. Cir. 1994)...............................................................20, 23

7 *Chef Am., Inc. v. Lamb-Weston, Inc.,*
358 F.3d 1371 (Fed. Cir. 2004)....................................................................7
8
*Clock Spring, L.P. v. Wrapmaster, Inc.,*
9 560 F.3d 1317 (Fed. Cir. 2009)..................................................................15

10
*Coleman v. Dines,*
11 754 F.2d 353 (Fed. Cir. 1985)..............................................................15, 21

12 *Eureka Fed. Sav. & Loan Ass'n v. American Cas. Co.,*
873 F.2d 229 (9th Cir. 1989) ......................................................................19
13
*Ferag AG v. Quipp Inc.,*
14 45 F.3d 1562 (Fed. Cir. 1995).....................................................................17

15 *Fitzgerald v. Arbib,*
268 F.2d 763 (C.C.P.A. 1959) ....................................................................21
16
*Hahn v. Wong,*
17 892 F.2d 1028 (Fed. Cir. 1989)...................................................................20

18
*Hitzeman v. Rutter,*
19 243 F.3d 1345 (Fed. Cir. 2001)...................................................................16

20 *In re Seagate,*
21 497 F.3d 1360 (Fed. Cir. 2007) (en banc)...............................................24, 25

22 *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
381 F.3d 1111 (Fed. Cir. 2004).....................................................................1
23
*Invitrogen Corp. v. Clontech Labs., Inc.,*
24 429 F.3d 1052 (Fed. Cir. 2005)...................................................................21

25 *Kendall v. Searles,*
173 F.2d 986 (C.C.P.A. 1949) ....................................................................21
26
*Linear Tech. Corp. v. Impala Linear Corp.,*
27 379 F.3d 1311 (Fed. Cir. 2004)...................................................................22

28

*Litchfield v. Eigen*,
    535 F.2d 72 (C.C.P.A. 1976) ............................................................... 22

*Lucent Techs. Inc. v. Gateway, Inc.*,
    525 F.3d 1200 (Fed. Cir. 2008) ......................................................... 3, 7

*Mangosoft, Inc. v. Oracle Corp.*,
    525 F.3d 1327 (Fed. Cir. 2008) ......................................................... 2, 7

*Medichem, S.A. v. Rolabo, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006) ............................................................ 21

*Merck & Co v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ............................................................. 2

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
    558 F.3d 1341 (Fed. Cir. 2009) ........................................................... 19

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ............................................................. 9

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ............................................................. 1

*Pause Tech., LLC v. TiVo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) ............................................................. 2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2006) (en banc) ............................................. 1

*Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) ............................................................. 20

*Shu-Hui Chen v. Bouchard*,
    347 F.3d 1299 (Fed. Cir. 2003) ...................................................... 20, 21

*Singh v. Brake*,
    317 F.3d 1334 (Fed. Cir. 2003) ........................................................... 20

*UMC Elecs. Co. v. United States*,
    816 F.2d 647 (Fed. Cir. 1987) ............................................................. 17

*United States v. Blackwood*,
    878 F.2d 1200 (9th Cir. 1989) ............................................................. 16

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................... 1

*Wiesner v. Weigert*,
    666 F.2d 582 (C.C.P.A. 1981) ............................................................. 22

1

**STATUTES**

2

35 U.S.C. § 103.................................................................................................. 17

3

**RULES**

4

Fed. R. Evid. 901 .............................................................................................. 16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **RESPONSIVE CLAIM CONSTRUCTION BRIEF**

2    **I.    CLAIM CONSTRUCTION**

3        **A.    Legal Standards Governing Claim Construction**

4        "It is a bedrock principle of patent law that the claims of a patent define the invention to

5    which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

6    (Fed. Cir. 2006) (en banc) (citations omitted).  "Attending this principle, a claim construction

7    analysis must begin and remain centered on the claim language itself, for that is the language the

8    patentee has chosen to particularly point out and distinctly claim the subject matter which the

9    patentee regards as his invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems,*

10    *Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (citations omitted).

11        When construing a claim, the court must look first to intrinsic evidence, starting with the

12    claim language itself. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

13    1996).  "[T]he claims themselves provide substantial guidance as to the meaning of particular

14    claim terms." *Phillips*, 415 F.3d at 1314.  "We indulge a heavy presumption that claim terms

15    carry their full ordinary and customary meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

16    1314, 1323 (Fed. Cir. 2003).  That is "the meaning that the term would have to a person of

17    ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

18        **B.    Asserted Claims and Agreed-Upon Claim Constructions**

19        O2 Micro alleges infringement of claims 1, 2, 4, 7, 8, 9, 11 and 14 of U.S. Patent

20    No. 7,417,382.  Exh. A.[1]  The parties have agreed upon the construction of four claim terms from

21    the asserted claims:  (1) "predetermined," (2) "threshold," (3) "predetermined threshold," and (4)

22    "liquid crystal display unit."  Exh. B (Joint Claim Construction and Prehearing Statement (filed

23    June 26, 2009) (DI 99) ("JCCPS")), at 2.

24

25

26

_____

27    [1] All exhibits referenced herein are exhibits to the Declaration of Dean G. Dunlavey, being filed
concurrently herewith.

28

1    **C.    Disputed Claim Constructions**

2        The parties' claim construction disputes center around one core issue:  when is the "time-

3    out sequence of a predetermined duration" provided?  Though not explicitly stated in its

4    construction, O2 Micro essentially argues that the claims should be rewritten such that the time-

5    out sequence is provided *while* the "first voltage signal exceeds and continues to exceed a

6    predetermined threshold."  Conversely, and true to the actual claim language, MPS and

7    ASUSTeK argue that the time-out sequence is provided *when* the first voltage signal has

8    remained above the predetermined threshold "for said predetermined duration."  Thus, under O2

9    Micro's construction, there is one "predetermined duration" between the time when the threshold

10   is first exceeded and shutdown.  Under MPS and ASUSTeK's construction, the time between

11   when the threshold is first exceeded and shutdown is divided into two durations.  In particular,

12   when properly construed, the claims specify that the "time-out sequence of a predetermined

13   duration" begins after the "first voltage signal" has remained above the "predetermined

14   threshold" for a period of time equal to the duration of the time-out sequence (i.e., "for said

15   predetermined duration"):

16


17

18

19

20       O2 Micro's proposed construction has no merit because it would render superfluous an

21   entire phrase in the "timer circuit" element, namely "for said predetermined duration."  This, of

22   course, is not permitted.  *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir.

23   2008) (claim terms should not be rendered superfluous by a proposed construction); *Merck & Co*

24   *v. Teva Pharm. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("[a] claim construction giving

25   meaning to all terms is preferred to one that does not do so"); *Pause Tech., LLC v. TiVo, Inc*.,

26   419 F.3d 1326, 1334 (Fed. Cir. 2005) ("[i]n construing claims [ ] we must give each claim term

27   the respect that it is due.").

28

Tellingly, in U.S. Patent No. 7,515,446 (Exh. C), a later-issued patent within the same patent family as the '382 patent, O2 Micro changed the claim language so as to omit the "for said predetermined duration" clause that it is asking this Court to ignore.

| '382 Patent: | '446 Patent: |
|---|---|
| "Timer Circuit" and "Protection Circuit" Elements | "Timer Circuit" and "Protection Circuit" Elements |
| a timer circuit coupled to said first feedback signal line for providing a time-out sequence of a predetermined duration when said first voltage signal exceeds a predetermined threshold for said predetermined duration; and | a timer circuit coupled to said capacitor divider for providing a time-out sequence of a predetermined duration when said first voltage signal exceeds a predetermined threshold; *MISSING* |
| a protection circuit coupled to said timer circuit, said first switch and said second switch for shutting down said first switch and said second switch after said predetermined duration. | a protection circuit coupled to said timer circuit, said first switch and said second switch for shutting down said first switch and said second switch after said predetermined duration. |

Thus, O2 Micro clearly recognizes that its proposed claim construction is wrong: Implicit in its proposed construction is an argument that the four-word phrase means nothing and the claim would mean the same thing with it or without it. As noted above, the Federal Circuit repeatedly has rejected proposed claim constructions that render claim language superfluous.

It may well be that O2 Micro made a drafting mistake, intending to claim one thing but instead claiming something else. But that is O2 Micro's problem. The Court is not allowed to cure O2 Micro's error.

> This court has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity. To do so would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.

*Lucent Techs. Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) (citations omitted); *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (quotation omitted) (holding that although the claim limitation "perpendicular" directly contradicted the specification, which recited "parallel," it is not the function of the courts "to rewrite claims to preserve their validity.").

1.   **"a timer circuit … for providing a time-out sequence of a predetermined duration"**

**MPS/ASUSTeK Proposed Construction: "a circuit that measures a time period having a duration determined beforehand."**

Each of the asserted claims contains the following limitation: "a timer circuit … for providing a time-out sequence of a predetermined duration." Exh. A, at 11:9-11; 12:37-39. This language is straight-forward. It specifies a "timer circuit" and its function. The function of the "timer circuit" is to "provid[e] a time-out sequence of a predetermined duration." The parties have agreed that the term "predetermined" means "determined beforehand." Exh. B, at 2.

MPS/ASUSTeK's construction is true to the words of this limitation and accounts for the agreed-upon construction. The "time-out sequence" is a period of time having a duration determined beforehand (i.e., a "predetermined duration"), and the "timer circuit" is a circuit that measures that period of time. *See* Exh. D (Amer. Heritage Dict.) at 1418 (defining "timer" as something that *measures* time); Exh. E (Random House Webster's College Dict.) at 1370 (same).

In contrast, O2 Micro's proposed construction – "a circuit that provides a 'predetermined' amount of time before shutdown occurs" – improperly seeks to inject the "shutdown" function into the "timer circuit" element. No such function, however, appears in the "timer circuit" claim element. Indeed, the function of "shutting down" the switches is associated with a different element of the claims, the "protection circuit" element.

O2 Micro's proposed construction directly conflicts with the specification of the '382 patent, which makes clear that protection circuit 62, not timer circuit 64, is responsible for shutting down the inverter circuit in the case of an overvoltage condition. Exh. A ('382 patent), at 8:40-9:7; Fig. 2. Timer circuit 64 simply measures the predetermined period of time corresponding to the "time-out sequence" and provides that information to protection circuit 62 via the "Time out" signal line shown in Fig. 2 (at right). Thus, O2 Micro's proposed construction, which attributes to the "timer



**Partially reproduced Fig. 2 of the '382 patent**

1  circuit" element the shutdown function of the "protection circuit," is clearly incorrect and should

2  be rejected.

3           2.      **"when said first voltage signal exceeds a predetermined threshold for
                    said predetermined duration"**

4

5           **MPS/ASUSTeK Proposed Construction: "the time-out sequence
            begins after the first voltage signal has remained above a voltage
            value determined beforehand for a period of time equal to the
            duration of the time-out sequence."**

6

7           Each of the asserted claims explicitly specifies that the "timer circuit" only begins to

8  provide its time-out sequence "when said first voltage signal exceeds a predetermined threshold

9  for said predetermined duration."  Exh. A, at 11:11-12, 12:39-40.  O2 Micro added these words

10  to the claims by amendment.  Exh. F (6/4/07 Amend. for '382 Patent), at 2, 3, 6, 7.

11          As actually written, this language does not provide O2 Micro with any credible

12  infringement theory because the accused products do not include two successive predetermined

13  periods.  (Indeed, O2 Micro's expert witness on infringement, Mr. Flasck, has offered no

14  opinions as to infringement under MPS and ASUSTeK's constructions.)  In response, O2 Micro

15  asks the Court to redraft the limitation to ignore the four words "for said predetermined duration"

16  and thereby change its plain meaning to eliminate the explicit requirement that the voltage

17  exceed the threshold for a predetermined period *before the timer circuit begins* to provide its

18  time-out sequence (which is then of the same duration).  In particular, O2 Micro contends that

19  this limitation means that "when the first voltage signal exceeds a 'predetermined threshold' for

20  the 'predetermined' amount of time, shutdown occurs."[2]

21          O2 Micro's construction again fails because it reads the words "for said predetermined

22  duration" completely out of the claims.  It also completely ignores the primary limitation of the

23  "timer circuit" element, which sets forth the conditions under which the "time-out sequence" is

24

25

26  [2] In his August 24, 2009 report, O2 Micro's technical expert as to invalidity issues, Dr. Mercer,
    offered an untimely "clarification" to the proposed construction that O2 Micro had presented in
27  the JCCPS.  As discussed below, that clarification fails to cure the flaws in O2 Micro's proposed
    construction.

28

"provid[ed]."  This construction also blurs the distinction between the claimed "timer" and "protection" circuits by importing the word "shutdown" into the "timer circuit" limitation.

###    a.    The Words "For Said Predetermined Duration" Must Impart Meaning to the Claims

The "timer circuit" claim element reads in pertinent part:

> a timer circuit . . . *for providing a time-out sequence* of a predetermined duration *when said first voltage signal exceeds a predetermined threshold for said predetermined duration*;

Exh. A ('382 patent), at 11:9–16, 12:37–44 (emphasis added).

The words "when said first voltage signal exceeds a predetermined threshold for said predetermined duration" unambiguously set forth the *conditions* that must be met before the "timer circuit" can perform its recited function of "providing a time-out sequence."  As written, the "timer circuit" provides the "time-out sequence" when the condition, "said first voltage signal exceeds a predetermined threshold for said predetermined duration," has been satisfied.  That is, in order for the "time-out" sequence *to begin*, the first voltage signal must: (1) first exceed the threshold, and (2) remain above the threshold for a period of time equal to "said predetermined duration," *i.e.*, the duration of the "time-out sequence."

O2 Micro's proposed construction impermissibly ignores the required *condition* that the first voltage signal must remain above the threshold for the "predetermined duration" before the "time-out sequence of a predetermined duration" can be provided.  Under O2 Micro's construction, the "time-out sequence" would begin – and end – at the instant shutdown occurs.



Stated differently, O2 Micro's proposed construction either impermissibly reads the phrase "for said predetermined duration" out of the claim or it impermissibly re-drafts the phrase "for providing a time-out sequence of a predetermined duration" to mean that it is the "timer circuit" that "shuts down the inverter circuit."  Either result is improper.

1    O2 Micro criticizes MPS and ASUSTeK's construction as allegedly lacking support in

2  the specification.  DI 157, 8-9.  It is true that the specification of the '382 patent states that "a

3  timer 64 is initiated once the OVP exceeds the threshold, thereby initiating a time-out sequence."

4  Exh.  A ('382 patent), at 8:64-65.  O2 Micro asserts that this passage suggests that the time-out

5  sequence begins when the first voltage signal exceeds the threshold, and need not wait until after

6  "said predetermined duration."  But that is the way that O2 Micro drafted the claims of the

7  '446 patent (shown above) – a patent that is not asserted in this lawsuit.  It is ***not*** the way O2

8  Micro drafted the '382 patent claims that are at issue here.  Indeed, O2 Micro *amended* the

9  claims of the '382 patent to specifically require that those two events occur sequentially.  Exh. F

10  (6/4/07 Amend. for '382 Patent), at 2, 3, 6.  The phrase "for said predetermined duration"

11  modifies "exceeds" and unambiguously specifies how long the first voltage signal must exceed

12  the threshold before the "time-out sequence" is allowed to begin.

13    The claim construction canon that a claim term should not be rendered superfluous is

14  especially strong where the term was added by amendment during prosecution.  *See Mangosoft*,

15  525 F.3d at 1330-31.  O2 Micro's addition of the phrase "for said predetermined duration"

16  during the June 4, 2007 amendment altered the meaning of the "timer circuit" element in one

17  simple way – it changed the condition that must be satisfied for the time-out sequence to begin.

18    There is no merit in O2 Micro's request that the Court redraft O2 Micro's own claims.

19  Courts must "construe the claim as written, not as the patentees wish they had written it."  *Chef*

20  *Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (declining to interpret the

21  claim phrase "heating the dough *to* 400 degrees" to mean "heating the dough *at* 400 degrees,"

22  despite the fact that heating the dough *to* 400 degrees was not described in the specification and

23  would provide a nonsensical result by turning the dough to charcoal).  *See also Lucent Techs.*,

24  525 F.3d at 1215 (defendant correctly construed the plain language of the claim, even though

25  that construction was not supported by the sole embodiment described in the specification); *Allen*

26  *Eng'g*, 299 F.3d at 1349 (court would not rewrite claims to correct obvious drafting error to

27  change "perpendicular" to "parallel," even though failure to do so rendered claims invalid)

28

1

2

**b.   Dr. Mercer's "Clarification" Continues to Ignore the Phrase "For Said Predetermined Duration" and to Improperly Import the "Shutdown" Function of the "Protection Circuit" Element into the "Timer Circuit" Element**

3

4        Months after the deadline for providing its proposed claim constructions, O2 Micro

5   served an expert report from its technical expert as to invalidity, Dr. Mercer.  In his report,

6   Dr. Mercer purported to "clarify" O2 Micro's construction of the term "when said first voltage

7   signal exceeds a predetermined threshold for said predetermined duration."  See Exhibit A to

8   DI 158, at 33-35 (¶¶ 98, 105). [3]  According to Dr. Mercer, the proper construction of the claim

9   element is "when the first voltage signal exceeds *and continues to exceed* a 'predetermined

10  threshold' for the 'predetermined' amount of time, shutdown occurs."  *Id.* (emphasis added.).

11       The addition of the words "and continues to exceed" does nothing to address the

12  fundamental errors in O2 Micro's proposed construction.  As with O2 Micro's original proposed

13  construction, the "clarification" fails to properly interpret the phrase "for said predetermined

14  duration."  Furthermore, as with O2 Micro's original proposed construction, the "clarification"

15  improperly attempts to import the "shutdown" function from the "protection circuit" element into

16  the "timer circuit" element.  So while all parties may agree that the "first voltage signal" must go

17

18  _____

19  [3] In the JCCPS, O2 Micro stated that it did not intend to call any witness at the Claim
    Construction Hearing.  Exh. B, at 7.  O2 Micro's submission of Dr. Mercer's report to "clarif[y]"
20  its claim construction arguments appears designed to circumvent its prior representation.  Dr.
    Mercer's deposition established that O2 Micro's attorneys wrote portions of his report, such as
21  the law sections.  Exh. G (8/27/09 Mercer Depo. Tr.), at 90:19 to 91:8.  In this manner, O2 Micro
    has attempted to change its proposed constructions after the Court's deadlines for doing so.  Lest
22  O2 Micro contend that MPS and ASUSTeK do not have expert support for their proposed
    constructions, Defendants note that their expert, Aris K. Silzars, Ph.D., has agreed with their
23  constructions.  Exh. H (Silzars' Initial Report), at 28-46.  Here, plain English is plain English.

24  It should also be noted that Dr. Mercer had to withdraw a portion of his report in an effort to
    preserve O2 Micro's assertions that its own products practice the asserted patent claims (which is
25  necessary to confer jurisdiction in the parallel ITC Investigation).  Exh. G, at 123-124.
    Dr. Mercer apparently did not realize that his artificial attempts to distinguish the prior art
26  MP1010 placed O2 Micro's own products outside the scope of the claims.  If there is any trial in
    this matter, MPS and ASUSTeK expect that the evidence will show Dr. Mercer lacks even
27  ordinary skill in the relevant art.  His expert report and deposition testimony establish that he
    misunderstands the operation of basic analog circuitry.  Dr. Mercer's apparent specialty is
28  digital, not analog, electronics.

above and remain above the threshold, which parallels Dr. Mercer's "continues to exceed" clarification, the remainder of his "clarification" is clearly wrong.

### c. O2 Micro Previously Argued that "Exceeds" Means "Above" and that Construction was Adopted by the Court

In a previous action related to U.S. Patent No. 6,259,615 (which is a parent of the '382 patent and shares the same specification), O2 Micro argued that to "exceed" a threshold means to be "above" the threshold.[4]  The court agreed with O2 Micro and construed "exceeds" to mean "above."[5]  O2 Micro later argued this Court should adopt the same construction.[6]  "Because [the] patents all derive from the same parent application and share many common terms, [the court] must interpret the claims consistently across all asserted patents."  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  Having prevailed in its prior argument, O2 Micro cannot avoid this construction of the term "exceeds" or its own arguments made to secure that construction.  Consistent with the claim construction that O2 Micro previously argued for this term (when it was to its advantage), MPS and ASUSTeK's construction clarifies that the first voltage signal "exceeds" a threshold when its value rises "above" the threshold.

### 3. "shutting down said first switch and said second switch after said predetermined duration"

### MPS/ASUSTeK Proposed Construction: "turning off the first and second switches when the time-out sequence has elapsed."

O2 Micro's proposed construction for this limitation – "turning off the first and second switches when the 'predetermined' duration has elapsed" – is close to MPS and ASUSTeK's proposed construction.  The parties agree that this limitation refers to turning off the first and second switches.  However, MPS and ASUSTeK's proposed construction continues by making

---

[4] Exh. I (O2 Micro's Opening Claim Construction Br., Case No. 2:03-CV-007 TJW (E.D. Tex. Dec. 1, 2004)) at 8-9, n.5, 19-20 (distinguishing between a feedback signal "exceeding the threshold" from "the feedback signal being below the threshold").

[5] Exh. J (Order on Claim Construction, Case No. 2:03-CV-007 TJW (E.D. Tex. Mar. 8, 2005)) at 10–12 (construing "only if said feedback signal *exceeds* such threshold signal" to mean "only if the feedback signal is *above* a predetermined threshold" (emphasis added)).

[6] Exh. K (O2 Micro's Opening Claim Construction Brief, Case No. C 04-2000 CW (N.D. Cal. Aug. 18, 2006)) at 14-16.

1   clear that "shutting down" occurs at the end of the time-out sequence.  In contrast, O2 Micro's

2   proposed construction renders the claim indefinite in that it fails to clarify the relevant

3   "predetermined duration" or its relationship to "shutting down."

4        MPS and ASUSTeK's proposed construction closely tracks the specification of the '382

5   patent, which states that "[d]rive pulses are disabled once the *time-out* is reached."  Exh. A ('382

6   patent), at 8:64–9:3 (emphasis added).  Thus, the specification of the '382 patent makes clear that

7   "shutting down" occurs at the end of the "time-out" sequence.

8        In contrast, O2 Micro's proposed construction requires only that "shutting down" occur

9   after a "predetermined duration."  Since there are two applicable "predetermined duration[s]"

10  introduced by the "timer circuit" element, O2 Micro's proposed construction would allow for the

11  protection circuit to shutdown the inverter circuit at the end of the first "predetermined duration"

12  – *just as the time-out sequence is beginning*.  This ambiguity and potentially nonsensical result

13  is avoided most easily by interpreting the claim element as MPS and ASUSTeK have proposed,

14  clarifying that the "shutting down" occurs at the end of the "time-out sequence."

15  **II.   MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT OF NON-INFRINGEMENT, UNDER EITHER PARTIES' PROPOSED CONSTRUCTION OF "TIMER CIRCUIT"**

16

17     **A.   O2 Micro Has Not Alleged Infringement Under MPS/ASUSTeK's Proposed Constructions**

18

19       If the Court adopts MPS and ASUSTeK's claim constructions, MPS and ASUSTeK are

20  entitled to summary judgment of non-infringement.[7]  The accused products do not include a

21  "timer circuit" that provides a time-out sequence of a predetermined duration after a first voltage

22  signal has exceeded a predetermined threshold for that predetermined duration.  O2 Micro's

23  infringement contentions are entirely dependent upon its proposed constructions.  O2 Micro's

24  infringement expert has not offered any opinion as to infringement under MPS and ASUSTeK's

25  proposed constructions.  Exh. M (9/1/09 Flasck Depo. Tr.), at 43:10 to 46:11.

26  [7] O2 Micro does not accuse the MPS integrated circuits of direct infringement, and O2 Micro's expert, Mr. Flasck, has agreed that the MPS ICs are themselves incapable of direct infringement.

27  Exh. L (Flasck Rept.) at 11-12.  Thus, MPS is also entitled to summary judgment of no direct infringement.

28

**B.      MPS and ASUSTeK Are Entitled to Summary Judgment of Non-Infringement Under O2 Micro's Proposed Constructions**

MPS and ASUSTeK are entitled to summary judgment of non-infringement even under O2 Micro's proposed constructions. That is because the signal in the accused products that O2 Micro contends is the "first voltage signal" does not "exceed and continue to exceed" what O2 Micro contends is the "predetermined threshold" for the "predetermined duration." Instead, even under O2 Micro's constructions, the alleged "first voltage signal" will periodically fall below the "predetermined threshold" throughout the "predetermined duration." MPS's testing has confirmed this, and neither O2 Micro nor Mr. Flasck has disputed the test results.

**1.      O2 Micro Has Used the MP1015 As "The Exemplar" For Its Infringement Contentions**

O2 Micro's expert, Mr. Flasck, has used the MP1015 IC as "the exemplar" for its infringement contentions, stating that all of the other accused products operate in a similar manner. The Rebuttal Expert Report of MPS's technical expert, Dr. Aris Silzars, explains the operation of this IC in detail. Exh. N, at 24-52.



Simplified Internal Schematic of the MPS MP1015 IC.

1   As shown in the above simplified schematic for the MP1015 inverter circuit, a voltage

2   representing the voltage across the lamp is fed back to the Open Lamp Fault comparator through

3   the VLFB pin.  O2 Micro alleges that the voltage signal that is provided to the pin labeled

4   "VLFB" is the "first voltage signal."  Exh. O (Flasck claim chart for MP1015), at 51.

5       Mr. Flasck's claim chart for the MP1015 does not identify the alleged "predetermined

6   threshold" that the "first voltage signal" must *exceed*.  Instead, he simply quotes the claim

7   language and says that the MP1015 is used in circuits that satisfy the language.  *Id*. at 52-53.  O2

8   Micro apparently chose this approach because the MP1015 senses an overvoltage condition by

9   determining whether the voltage supplied to "VLFB" has instantaneously dropped *below* zero

10  volts (ground) as opposed to determining when it "exceeds" some "predetermined threshold."

11

12

13  

14

15

16

17      MP1015 Datasheet, FIG. 5.  Exh. P, MONO-ITC-00527779 (partial).

18

19      As shown in the above figure taken from the MP1015 datasheet, "[t]he VLFB pin (#18) is

20  used to detect whether an open lamp condition has occurred.  During normal operation the VLFB

21  pin is typically at 5V DC with an AC swing of ±2.5V."  If the lamp fails to ignite as the output

22  voltage increases (*e.g.*, because it is broken, missing, or burned out), then the AC voltage on the

23  VLFB pin momentarily will swing <u>below</u> zero volts.  Exh. P (MP1015 datasheet), MONO-ITC-

24  00527775, -7779.  When that occurs, the output of the OLF comparator goes high and it remains

25  high for as long as the VLFB voltage remains negative.  The duration of this negative transition

26  will be a very small fraction of the total period of the waveform.  The length of time that the

27  "first voltage signal" will be below zero volts will be a tiny fraction of the total cycle, likely less

28  than 1 µs.  *See* Exh. N (Silzars' Rebuttal Report), at 25-28.  O2 Micro's infringement expert

1   agreed that this is how the "exemplar" MP1015 circuitry works (Exh. M (9/1/09 Flasck Depo.

2   Tr.), at 149:15 to 151:10) and, by extension, how the circuitry of all the accused circuit work.

        2.   **The Accused MPS ICs Are Designed So That the Alleged "First Voltage Signal" Does Not "Exceed and Continue[ ] to Exceed" a "Predetermined Threshold" During the Alleged "Predetermined Duration"**

5           During his deposition, Mr. Flasck argued that the alleged "first voltage signal" can be an

6   AC signal, and when it is, the relevant "predetermined threshold" measurement is the peak-to-

7   peak amplitude of the AC signal.  Exh. M (9/1/09 Flasck Depo. Tr.), at 147:9 to 148:11.  For

8   purposes of this motion, MPS and ASUSTeK will assume, *arguendo*, that Mr. Flasck is correct.

9           Accepting Mr. Flasck's argument, and accepting O2 Micro's "timer circuit" claim

10  construction which specifies, *inter alia*, that "the first voltage signal exceeds *and continues to*

11  *exceed* a 'predetermined threshold' for the 'predetermined' amount of time," the MP1015

12  circuitry can not infringe the asserted claims of the '382 patent, because the amplitude of the AC

13  voltage on the VLFB pin will not exceed the alleged "predetermined threshold for said

14  predetermined duration."  Exh. N (Silzars' Rebuttal Report), at 28-38.  In particular, in the

15  accused products, when the output of the OLF comparator is high, it causes a 475 µA COMP

16  current sink to draw current from the capacitor labeled $C_{COMP}$.  Exh. P (MP1015 datasheet),

17  MONO-ITC-00527774.  This lowers the voltage on that capacitor, which in turn decreases the

18  pulse width (duty cycle) of the power switches and thus decreases the AC voltage placed across

19  the CCFL.  This decreases the amplitude of the voltage fed back to the VLFB pin, so that it no

20  longer "continues to exceed" the "predetermined threshold."  Exh. N, at 28-38.  Thus, the

21  accused products and inverters employing the accused products do not practice the "timer

22  circuit" element of the asserted claims, even under O2 Micro's proposed constructions.

        3.   **Testing Has Confirmed that the Alleged "First Voltage Signal" Does Not "Exceed and Continue to Exceed" the Alleged "Predetermined Threshold" for the Alleged "Predetermined Duration"**

25          Dr. Silzars tested, and oversaw the testing, of the accused MPS ICs during open lamp

26  conditions.  The tests confirmed that the alleged "first voltage signal does <u>not</u> remain above the

27  accused threshold 'for the predetermined duration' prior to shutdown."  Instead, "the voltage at

the output of the capacitor divider is periodically and consistently <u>not</u> crossing the accused threshold, but is periodically and consistently falling back down below the 'threshold.'"  Exh. N (Silzars' Rebuttal Report), at 31-36.

### 4.   O2 Micro's Infringement Expert Has Not Disputed Dr. Silzars' Test Results

Mr. Flasck does not dispute Dr. Silzars' test results.  During his deposition, he acknowledged that the amplitude of the "first voltage signal" will periodically shrink during an overvoltage condition so that its amplitude no longer exceeds the "predetermined threshold."  Exh. M (9/1/09 Flasck Depo. Tr.), at 160: 6 to 166:14.  Mr. Flasck proceeded to argue that "anyone of skill in the art" would understand periodically rising above and then falling below a threshold is the same thing as "exceeding" the threshold (*id.* at 164:10-13), but that argument contradicts plain English, O2 Micro's proposed claim construction, and the construction offered by O2 Micro's other technical expert, Dr. Mercer.  O2 Micro has stated its position:  the "first voltage signal" must "exceed and continue to exceed" the alleged "predetermined threshold *to when shutdown occurs*."  O2 Micro cannot have one claim construction to support its infringement contentions and another to support its contention that the '382 patent claims are valid.  Under O2 Micro's own proposed constructions for the "timer circuit" element, the accused products do not infringe.

### 5.   O2 Micro Has Not Provided Infringement Contentions Under the Doctrine of Equivalents

MPS and ASUSTeK anticipate that O2 Micro may respond to this summary judgment motion by claiming that it intends to pursue a doctrine of equivalents (DOE) theory.  Should O2 Micro make such a claim, the Court should deny it.  O2 Micro's expert has not offered an opinion as to infringement under the DOE.  During his deposition, Mr. Flasck admitted that he never performed an element-by-element doctrine of equivalents analysis with respect to the accused MPS products, or with respect to any product containing an accused MPS IC.  Exh. M, at 50:4-11.  It is now far too late for O2 Micro to try to conjure up a DOE argument.

1

2

### III.   OPPOSITION TO O2 MICRO MOTION FOR SUMMARY JUDGMENT REGARDING INVENTION DATE OF THE '382 PATENT

3

#### A.   Introduction and Summary of Argument

4

O2 Micro's motion regarding the invention date of the '382 patent contains the same

5

arguments that O2 Micro made in its Motion to Strike the Expert Report of Marc Herniter, Ph.D.

6

(DI 135).  As set forth in MPS and ASUSTeK's opposition to that motion, O2 Micro's

7

arguments are frivolous.  DI 183.  Judge Gildea, the judge presiding over the International Trade

8

Commission investigation concerning the same patent, has already denied O2 Micro's

9

counterpart motion in the ITC.  Exh. Q (Order 29, issued September 17, 2009), at 7.

10

MPS and ASUSTeK will not repeat all of  the arguments made in their Opposition to the

11

Herniter motion, but instead will simply summarize some of them, and note that that Opposition

12

is incorporated herein by reference.  It is likely that, by the time of the hearing on this motion,

13

the Court will have ruled on that motion, and its ruling will be binding as law of the case.

14

#### B.   The Invalid "Inventions" Claimed in U.S. Patent No. 6,396,722 Were Different from the Claimed Inventions of the '382 Patent

15

The '382 patent did not even exist at the time of the 2007 trial.  The patent claims being

16

asserted in this case contain elements that were not present in the claims of the '722 patent.  For

17

example, none of the '722 patent claims included (1) a capacitor divider, (2) a first feedback

18

signal line coupled to the capacitor divider, (3) a timer circuit coupled to the first feedback signal

19

line, or (4) a protection circuit coupled to the timer circuit, as recited in the asserted independent

20

claims of the '382 patent.

21

It is a fundamental tenet of patent law that each claim of each patent must be considered

22

individually in determining its validity.  *See, e.g.*, *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560

23

F.3d 1317, 1325 (Fed. Cir. 2009).  Where a patentee seeks to prove conception of a particular

24

claim on a date earlier than the application filing date, the inventor "must show possession of

25

*every* feature recited in the [claim], and that *every* limitation of the [claim] must have been

26

known to the inventor at the time of the alleged conception."  *Coleman v. Dines*, 754 F.2d 353,

27

359 (Fed. Cir. 1985) (emphasis added); *see also Hitzeman v. Rutter*, 243 F.3d 1345, 1354 (Fed.

28

Cir. 2001) (same).  Thus, even if O2 Micro were correct that the jury at the 2007 trial made

15

findings concerning the conception date for a particular claim in the '722 patent (which it did not), such a finding would have no bearing on whether O2 Micro could establish a similar conception date for a claim in the '382 patent.

**C.    The Court's Decision to Admit Into Evidence the "Feb., 18, 1998" Schematics in the 2007 Trial Did Not Represent a Finding Of Authenticity**

O2 Micro argues that "[i]mplicit" in the Court's decision to admit the schematics dated "Feb., 18, 1998" [sic] in the 2007 trial was a finding "that the schematics satisfied the authenticity requirement of Federal Rules of Evidence 901." DI 157, at 20. O2 Micro's contention reflects a misunderstanding of the Federal Rules of Evidence.

A trial court's decision to allow a document to be admitted into evidence does not constitute a judicial determination that the document is authentic. It only means that the court found there was sufficient foundation to allow the jury to consider the document. *United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989).

The Court's actions after admitting the schematic drawings dated "Feb., 18, 1998" were entirely consistent with this legal authority. The Court allowed Dr. Lin to be cross-examined as to numerous facts undermining his claim that the schematics were actually created in February 1998. This questioning established that (1) Lin did not show the schematic drawings to anyone at O2 Micro during 1998, or at least O2 Micro could not produce any such witness to testify (Exh. R (5/3/07 Trial Tr.) at 655:18 to 657:12), (2) Lin did not tell anyone at O2 Micro about his alleged invention during 1998 (*id.*, at 657:13 to 659:25), and (3) O2 Micro did not have, or at least could not produce, any backup files from 1998 containing the schematic drawings. *Id.*, at 660:1-15. Clearly the Court would not have allowed this questioning if it had conclusively determined that the drawings were authentic and had been created in February 1998.

Thus, this Court's evidentiary ruling in 2007 to allow the jury to consider the drawings bearing the phrase "Feb., 18, 1998" was not a conclusive ruling as to their authenticity, did not bear in any way on the claims asserted in this case, and does not allow O2 Micro to shield itself from what we now know to be its false testimony in the 2007 trial regarding the drawings.

16

**D.     To the Extent that the Jury Based Its Obviousness and On-Sale Bar Verdicts On MPS's Development of the MP1010, Those Verdicts Establish that the Jury Rejected Dr. Lin's Claimed February 1998 Conception Date**

At the 2007 trial, the jury found that:

- All of the asserted patent claims were invalid as being obvious at the time the "inventions" were made;

- All of the asserted patent claims were invalid based upon the "on-sale bar" provision of the patent laws;

- MPS's MP1010 product and associated external circuitry did not literally infringe any of the asserted patent claims; and

- MPS's MP1010 product did not anticipate any of the asserted patent claims.

Exh. S (5/15/07 Verdict).

The Federal Circuit has recognized that a party asserting that a patent claim is invalid under the on-sale bar may demonstrate that "the subject matter of the sale or offer to sell <u>either</u> fully anticipated the claimed invention <u>or</u> would have rendered the claimed invention obvious by its addition to the prior art." *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995) (quoting *UMC Elecs. Co. v. United States*, 816 F.2d 647, 656 (Fed. Cir. 1987) (emphasis added)).

O2 Micro contends that the jury's findings as to invalidity were based upon the MP1010. DI 157, at 17-18.  If that is correct, the only way to reconcile the jury's on-sale bar finding with the rest of the verdict is to conclude that the jury based that finding upon the "obviousness" prong of the on-sale bar.  That is, while the MP1010 (which was on sale more than one year before the July 22, 1999 patent application filing date) did not anticipate the claimed inventions because it did not practice the asserted patent claims, it did render the claims obvious.

Furthermore, assuming that O2 Micro is correct that the jury based its obviousness finding upon the MP1010, the jury <u>must</u> have concluded that MPS's development efforts on the MP1010 predated Lin's conception.  Under 35 U.S.C. § 103, a patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious ***at the time the invention was made*** to a

1  person having ordinary skill in the art" (emphasis added). Accordingly, the jury must have

2  rejected Lin's testimony and concluded that he "made" his "inventions" after MPS completed

3  development of the MP1010 – *i.e.*, after February 1998. Thus, while the jury made no specific

4  findings concerning authenticity or Lin's alleged February 1998 invention date, the logical

5  deduction to be drawn from the verdict is that the jury rejected O2 Micro's arguments as to both.

6  ### E. Precluding MPS from Challenging a Conception Date that Rests on False Testimony Followed by a Protracted Cover-Up Would Be Manifestly Unfair

7

8  Beyond its abject lack of legal merit, O2 Micro's motion is a blatant attempt to conceal

9  the fact that Dr. Lin and a second O2 Micro executive, Adam Badgett, gave false testimony at

10 the 2007 trial in an attempt to mislead the jury. During the present lawsuit, when O2 Micro

11 learned that MPS had found an expert that could confirm the falsity of the prior testimony, O2

12 Micro tried to engage in a cover up and had its corporate representative falsely testify that Lin

13 used a different program to create his schematics – one that automatically dated schematic

14 drawings without user input. Dr. Herniter's report eventually caused O2 Micro to give up that

15 false position as well, after which it resorted to this motion (among others) to cover up its

16 misconduct. *See* DI 183 (MPS and ASUSTeK Entities' Opposition to O2 Micro's Motion to

17 Strike Expert Report of Dr. Marc E. Herniter, Ph.D.), at 7-11.

18 As explained by Dr. Herniter, contrary to everything that O2 Micro said back in 2007,

19 and contrary to the cover up it engaged in earlier this year, the PSpice computer program that

20 Dr. Lin used did not automatically date the drawings. In reality, Lin manually entered the date in

21 the title block, including the typographical error, at some unknown date, and he could have

22 entered any date he wanted to enter. The first computer simulations were run on June 24, 1999,

23 which strongly supports the conclusion that Lin created the drawings at that time. He stored the

24 drawings in a folder on his computer's hard drive that he labeled "MPS." O2 Micro

25 subsequently destroyed the computer, the hard drive and the file folder, thereby preventing the

26 Court, MPS and ASUSTeK from determining when Lin really created the drawings. This is the

27 misconduct that O2 Micro wants to bury under the guise of its collateral estoppel motion.

28

1   Accordingly, it is difficult to imagine a situation that would be more unfair than to allow

2   O2 Micro to apply collateral estoppel to its advantage.  *See Eureka Fed. Sav. & Loan Ass'n v.*

3   *American Cas. Co.*, 873 F.2d 229, 234 (9th Cir. 1989) ("[I]t is inappropriate to apply collateral

4   estoppel when its effect would be unfair.")

5   **IV.   IF THE PRINCIPLES OF COLLATERAL ESTOPPEL ARE HELD TO BE
        APPLICABLE HERE, MPS AND ASUSTEK CROSS-MOVE FOR SUMMARY**

6   **JUDGMENT THAT ALL OF THE ASSERTED CLAIMS OF THE '382 PATENT
        ARE INVALID**

7   O2 Micro asserts that "the claims of the '722 and '382 patents are the same" for collateral

8   estoppel purposes.  (DI 157, at 22.)  The determination that each asserted claim of '722 patent is

9

10  invalid is now final.  *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341 (Fed.

11  Cir. 2009).  Accordingly, since the '722 claims are invalid, MPS and ASUSTeK cross-move for

12  summary judgment that the asserted claims of the '382 patent are invalid.

13  **V.   MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT THAT O2
        MICRO IS NOT ENTITLED TO AN INVENTION DATE PRIOR TO THE
        JULY 22, 1999 FILING OF ITS PROVISIONAL PATENT APPLICATION**

14

15  The '382 patent claims priority to U.S. Provisional Application No. 60/145,118, filed on

16  July 22, 1999, which is the '382 patent's earliest priority date.  There is prior art, such as the

17  MPS MP1010 product, which predates that priority date.  In an effort to avoid this prior art, O2

18  Micro alleges that Dr. Lin conceived the claimed invention in the '382 patent by February 1998

19  and thereafter diligently worked to reduce it to practice over the next seventeen months, until

20  finally filing the provisional application.

21  MPS and ASUSTeK are entitled to summary judgment that O2 Micro's earliest invention

22  date is July 22, 1999.  There is no evidence corroborating Lin's alleged conception in February

23  1998 nor is there any evidence corroborating diligence between February 1998 and July 1999.

24  The earliest possible conception date is July 1999, which is the date of the earliest O2 Micro

25  document that arguably discloses all of the claim limitations in the '382 patent.  The first

26  reduction to practice, which is a constructive reduction to practice, occurred on July 22, 1999,

27  when O2 Micro filed the provisional patent application.

28

**A.     Legal Standards Governing Conception and Reduction to Practice**

       **1.     To Establish Conception, the Inventor Must Establish Possession of Every Feature Recited in a Particular Patent Claim**

"Conception is the touchstone of inventorship, the completion of the mental part of invention. It is 'the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (citations omitted). "A conception must encompass ***all*** limitations of the claimed invention." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003) (emphasis added).

       **2.     Recognizing a Problem is not Conception**

"An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." *Burroughs*, 40 F.3d at 1228. Recognizing a problem is not conception. *See, e.g.*, *Singh*, 317 F.3d at 1341 ("[e]ven if [an inventor's notebook] entry expressed the problem, it did not provide the solution").

       **3.     A Patentee Seeking an Invention Date Prior to the Application Filing Date Must Corroborate an Inventor's Testimony with Independent Evidence**

"It is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony." *Shu-Hui Chen v. Bouchard,* 347 F.3d 1299, 1309 (Fed. Cir. 2003). The inventor "must provide ***independent*** corroborating evidence in addition to his own statements and documents." *Hahn v. Wong,* 892 F.2d 1028, 1032 (Fed. Cir. 1989) (emphasis added). *See also Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009). "Because it is a mental act, courts require corroborating evidence of a contemporaneous disclosure ***that would enable one skilled in the art to make the invention***." *Burroughs*, 40 F.3d at 1228 (emphasis added).

### 4. The Corroboration Requirement is Directed at Preventing Inventors from Misrepresenting their Thought Processes

"[B]ecause of the danger in post-hoc rationales by an inventor claiming priority, the court requires objective evidence to corroborate an inventor's testimony concerning his understanding of the invention." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1065 (Fed. Cir. 2005). "[T]he corroboration requirement provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). It is "prophylactic in application" and "provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates." *Id.*

### 5. Allegedly Corroborating Evidence is Evaluated Under a "Rule of Reason"

"[W]hether a putative inventor's testimony has been sufficiently corroborated is determined by a 'rule of reason' analysis, in which 'an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.'" *Chen,* 347 F.3d at 1309 (citations omitted). The corroboration must be independent of the inventor's testimony. "The rule of reason . . . does not dispense with the requirement for some evidence of independent corroboration." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985).

### 6. A Patentee Seeking an Invention Date Prior to the Application Filing Date Must Establish Diligence from the Conception Date to the Date of a Reduction to Practice

The time period for which diligence must be shown by the party first to conceive is from a date just prior to the effective date of the prior art reference to the date of reduction to practice by the party first to conceive. *Chen*, 347 F.3d at 1309. The party alleging prior invention must be able to show diligence throughout the entire critical period. *See Fitzgerald v. Arbib*, 268 F.2d 763, 766 (C.C.P.A. 1959). "[A]n inventor's testimony on the question of diligence must be corroborated." *Kendall v. Searles*, 173 F.2d 986, 993 (CCPA 1949).

Corroboration is determined by application of a rule of reason, which requires that an "evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Linear Tech. Corp. v. Impala Linear Corp.*,

1   379 F.3d 1311, 1327 (Fed. Cir. 2004) (finding that a notebook diagram inconclusive of what

2   circuitry the patentee developed failed to corroborate the patentee's claim).

3         "[E]vidence of constant effort is not required to establish reasonable diligence" but

4   unexplained delays may indicate a lack of diligence. *Wiesner v. Weigert*, 666 F.2d 582, 589

5   (C.C.P.A. 1981) (diligence not shown where only explanation for delay explained was inventor

6   testimony that efforts continued during the critical period). Additionally, efforts toward a

7   solution of the problem at hand by different means than those represented by the patent claim is

8   not credited as diligence. *See Litchfield v. Eigen*, 535 F.2d 72, 76 (C.C.P.A. 1976).

9         **B.      There Is No Evidence that Lin Conceived of His Invention Before July 1999**

10        This case epitomizes the reasons that an inventor must "provide independent

11   corroborating evidence in addition to his own statements and documents," if he is to be entitled

12   to a conception date earlier than the patent application filing date. O2 Micro's "February 1998

13   conception" story is completely dependent upon the uncorroborated testimony of its putative

14   inventor, Dr. Lin. That testimony is in conflict with the actual evidence and inherently

15   unbelievable. Moreover, there is no corroboration for Dr. Lin's claim of diligence. Under the

16   established caselaw, O2 Micro's earliest invention date is July 22, 1999.

17              **1.      The "Feb., 18, 1998" Drawings Would Not Corroborate Conception,
                         Even If O2 Micro Could Establish that They Were Created In**
18                       **February 1998**

19        O2 Micro alleges that certain schematic drawings it has produced in this lawsuit, which

20   contain an entry of "Feb., 18, 1998" [sic] in the title block (Exh. T), were created in February

21   1998. O2 Micro claims that these drawings corroborate an alleged February 1998 conception

22   date. Contrary to O2 Micro's assertions, the "Feb., 18, 1998" drawings would not corroborate

23   conception under any circumstances, as they do not disclose any of the relevant claim limitations

24   of the '382 patent, *e.g.*, (1) a capacitor divider, (2) a voltage feedback signal line coupled to the

25   capacitor divider, (3) a timer circuit coupled to the voltage feedback signal line, or (4) a

26   protection circuit coupled to the timer circuit for shutting down the switching of the inverter.

27   The drawings make no mention of open lamp or over-voltage protection and do not disclose any

28   circuitry for providing such protection. *See* Exh. T (drawings); Exh. H (Silzars' Initial Report),

1    at 74-82. Indeed, Lin has admitted that "[t]he timeout function [*i.e.*, the "time-out sequence"]

2    did not show in the [Feb., 18, 1998] simulation." Exh. U (11/14/05 Trial Tr.), at 110:12-15.

3         The law "require[s] corroborating evidence of a contemporaneous disclosure *that would*

4    *enable one skilled in the art to make the invention*." *Burroughs*, 40 F.3d at 1228 (emphasis

5    added). Clearly the very basic circuitry depicted in the "Feb., 18, 1998" drawings do not satisfy

6    this requirement – they do not disclose any of the relevant claim elements, much less enable one

7    skilled in the art to make the claimed inventions. Tellingly, neither of O2 Micro's technical

8    experts has offered an opinion that the very basic circuitry depicted in the "Feb., 18, 1998"

9    drawings would enable a person of skill in the art to make the claimed inventions.

10        On an even more fundamental level, O2 Micro does not have any evidence – other than

11   Dr. Lin's uncorroborated testimony – that Lin created the "Feb., 18, 1998" drawings in February

12   1998. As set forth in Dr. Herniter's expert report, Lin could have inserted the phrase "Feb., 18,

13   1998" on the drawings at any time up to and including June 24, 1999. Exh. V, at 6-7, 16-18.

14        **2.    The Actual Evidence Is at Odds With Lin's Claim of a February 1998
                   Conception Date**

15        The evidence that does exist is completely at odds with Lin's claim that he conceived in

16   February 1998. For example, Lin testified in the 2007 trial that he conceived of his invention as

17   the solution to "arcing problems" that O2 Micro's customers were having with the existing O2

18   Micro products. Exh. W (5/2/07 Trial Tr.), at 551:8 to 552:21, 557:12 to 558:16, 569:2-6. Yet

19   Dr. Lin has admitted that he has no memory of disclosing his alleged invention to any of these

20   customers prior to July 1999. Exh. X (6/18/09 Lin Depo. Tr.), at 382:18 to 383:2, 385:7–17. O2

21   Micro cannot even identify anyone *inside O2 Micro* to whom Lin disclosed his alleged invention

22   prior to the middle of 1999. Indeed, O2 Micro has admitted that it cannot identify a single

23   individual to whom Dr. Lin showed the "Feb., 18, 1998" drawings prior to June 24, 1999. *See*

24   Exh. Y (O2 Micro July 23, 2009 Responses to ASUSTeK Third Set of Interrogatories), at 8.

25   Moreover, there is no mention of the alleged invention, or even a capacitor divider, lamp voltage

26   feedback signal, or associated timer circuit, in Lin's April 1999 communications with O2

27

28

1  Micro's patent counsel.  Exhs. Z, AA.  Those documents show that in April 1999 Lin was

2  pursuing a different approach to open lamp conditions than what is claimed in the '382 patent.

3      If, in February 1998, Dr. Lin had the solution to O2 Micro's serious product failures, why

4  did he keep it a secret from everyone, both inside and outside the company, for the next 16

5  months?  Why did O2 Micro allow its customers to ship computers prone to dangerous high

6  voltage "arcing" for more than two-and-a-half years after Lin had discovered the solution?  Why

7  are there no O2 Micro documents depicting capacitor dividers, timer circuits, and shutdown

8  circuitry that pre-date the general availability of MP1010-based inverters employing such

9  components and circuitry?  Why do Lin's sporadic notebook entries from 1998 reflect

10  complaints from customers but no solution to those complaints?  The only logical explanation is

11  that Lin did not have any concept of the claimed invention in February 1998.

### 3.   O2 Micro Has Not Met Its Burden of Providing Independent Evidence Corroborating Dr. Lin's Testimony

12
13  O2 Micro has the burden of presenting independent evidence corroborating Lin's claim

14  that he conceived in February 1998.  It has failed to produce any such evidence.  Accordingly,

15  MPS and ASUSTeK are entitled to summary judgment that O2 Micro's earliest invention date is

16  July 22, 1999.

17

## VI.   MPS AND ASUSTEK ARE ENTITLED TO SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT AND NO ENHANCED DAMAGES

18

19      The '382 patent issued on August 26, 2008.  On December 15, 2008, O2 Micro alleged

20  infringement of the '382 patent in its ITC complaint.  On February 11, 2009 O2 Micro amended

21  its counterclaims in this case to include allegations of infringement of the '382 patent.  DI 25.

22  O2 Micro alleged the infringement was willful and entitled it to enhanced damages.  *Id*.

23  Nonetheless, O2 Micro never moved for a preliminary injunction.

24      "[P]roof of willful infringement permitting enhanced damages requires at least a showing

25  of objective recklessness."  *In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).  "[T]o

26  establish willful infringement, a patentee must show by clear and convincing evidence that the

27  infringer acted despite an objectively high likelihood that its actions constituted infringement of

28  a valid patent."  *Id*.  "If this threshold objective standard is satisfied, the patentee must also

1   demonstrate that this objectively-defined risk . . . was either known or so obvious that it should

2   have been known to the accused infringer." *Id.* "[I]n ordinary circumstances, willfulness will

3   depend on an infringer's prelitigation conduct." *Id.* at 1374. "A patentee who does not attempt

4   to stop an accused infringer's activities [by seeking a preliminary injunction] should not be

5   allowed to accrue enhanced damages based solely on the infringer's post-filing conduct." *Id.*

6          O2 Micro has no basis for pursuing a claim for willful infringement or enhanced

7   damages. It never moved for a preliminary injunction. Moreover, O2 Micro has lost or had to

8   dismiss with prejudice every other patent infringement action it has brought against MPS. On

9   February 11, 2004, this Court granted MPS summary judgment of non-infringement at to U.S.

10  Patent No. 6,259,615. Exh. BB. On May 15, 2007, the jury found that the claims of the '722

11  patent were invalid and not literally infringed. Exh. S. (As noted above, these are the claims that

12  O2 Micro contends are "the same" as the '382 patent claims for collateral estoppel purposes.)

13  On August 26, 2008, O2 Micro dismissed with prejudice its infringement claims concerning U.S.

14  Patent No. 6,804,129, and provided MPS with a covenant not to sue MPS or its customers.

15  Exh. CC. In this case, O2 Micro originally accused MPS and ASUSTeK of willfully infringing

16  U.S. Patent Nos. 6,809,938, 6,856,519, and 7,120,035. Yet on June 30, 2009, O2 Micro

17  stipulated to a dismissal with prejudice and covenant not to sue as to those patents. DI 100. In

18  addition, as described above, MPS and ASUSTeK have very strong non-infringement defenses.

19  Furthermore, the MP1010 prior art and other invalidating prior art clearly has priority over O2

20  Micro's effective filing date of July 22, 1999. Against this factual background, O2 Micro has no

21  evidence of, and cannot establish, "objective recklessness" on the part of either MPS or

22  ASUSTeK.

23  **VII.    CONCLUSION**

24         For all the reasons set forth above, MPS and the ASUSTeK entities respectfully request

25  that the Court (1) adopt their proposed claim constructions, (2) grant their motions for summary

26  judgment, and (3) deny O2 Micro's motion for summary judgment.

27

28

1   Dated:  October 1, 2009

2                                      Respectfully submitted,

3                                      LATHAM & WATKINS LLP

    By:  _____/s/_____
4                                             Mark A. Flagel

5                                      Attorneys for Plaintiff and Counterclaim-Defendant
                                       Monolithic Power Systems, Inc.
6

7   Dated:  October 1, 2009           FINNEGAN, HENDERSON, FARABOW,
                                       GARRETT & DUNNER, L.L.P.
8

    By:  _____/s/_____
9                                             Scott R. Mosko

10                                     Attorneys for Plaintiff and Counterclaim-Defendant
                                       Monolithic Power Systems, Inc. and
11                                     Counterclaim-Defendants ASUSTeK Computer Inc. and
                                       ASUS Computer International
12

13  LA\2019182.9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28