IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>O2 MICRO INTERNATIONAL LIMITED,<br><br>    Defendant.<br>_____<br><br>O2 MICRO INTERNATIONAL LIMITED,<br><br>    Counterclaimant,<br><br>  v.<br><br>MONOLITHIC POWER SYSTEMS, INC., ASUSTEK COMPUTER INC., ASUSTEK COMPUTER INTERNATIONAL AMERICA, BENQ CORPORATION, and BENQ AMERICA CORPORATION,<br><br>    Counterclaim-Defendants.<br>_____/ | No. 08-04567 CW<br><br>ORDER REGARDING ATTORNEYS' FEES AND NON-TAXABLE COSTS |

On March 3, 2011, the Court issued an Order Granting Plaintiff Monolithic Power Systems, Inc. (MPS) and Counterclaim-Defendant Asustek's Motion for Attorneys' Fees and Non-Taxable Costs on the ground that the case was exceptional under 35 U.S.C. § 285. The Court stated that "based on O2 Micro's vexatious litigation

strategy, litigation misconduct and unprofessional behavior, MPS and Asustek are entitled to reasonable attorneys' fees," and reserved its decision on the amount pending the filing of documentation for the fees. On May 5, 2011, MPS submitted the required documentation and requests attorneys' fees in the amount of $13,290,092, non-taxable costs in the amount of $663,151[1] and expert witness fees of $269,150.[2] Defendant O2 Micro International Limited (O2 Micro) objects to the amount of attorneys' fees requested and the request for expert witness fees. In response to O2 Micro's opposition, MPS reduces the amount of attorneys' fees requested to $11,519,987.

Having considered all the papers filed by the parties, the Court awards $663,151 in non-taxable costs and denies the request for expert witness fees. Because of the complexity of calculations involved in determining the amount of the attorneys' fee award, the Court will not calculate it but will indicate what will be allowed and disallowed. MPS must then submit its calculation of attorneys' fees awarded based on the Court's determination.

                                BACKGROUND

MPS initially retained the Fish & Richardson (FR) law firm, which was replaced by the law firms of Finnegan, Henderson, Farabow, Garrett & Dunner (Finnegan) and Latham and Watkins (Latham). Latham was lead counsel for MPS in this case and co-

---

[1] The Court's March 3, 2011 Order awarded MPS $339,315 in taxable costs. MPS indicates that O2 Micro has not paid these costs.

[2] All amounts less than one dollar will be rounded down or up to the closest whole number.

2

counsel for MPS in an action before the International Trade Commission (ITC). Finnegan was lead counsel for Asustek and co-counsel for MPS in this case. Finnegan was lead counsel in the ITC case. The fee request includes the services of these three firms.

MPS and FR agreed that FR's services would be compensated at its market rate less a ten percent discount. MPS and Latham agreed that Latham's legal services would be compensated at its normal billing rate less a ten percent discount. In addition, MPS and Latham agreed to a fee limitation, but the conditions triggering the limitation never arose. Therefore, MPS has compensated Latham at its normal rate less ten percent. Finnegan also billed at its market rate less ten percent. In early March 2009, the fee agreement between MPS and Finnegan was changed to include a series of incentives based upon the outcome of the litigation. MPS and Finnegan finally agreed to a fixed monthly payment plan, the total of which would not exceed $4,000,000, beginning on March 1, 2009. Later, because of the large number of depositions required, MPS agreed it would renegotiate the amount it would pay Finnegan. However, this renegotiation has not occurred; MPS indicates that it will complete fee negotiations with Finnegan after the Court resolves the current fee dispute. Since March 2009, Finnegan has received approximately $4,000,000 from MPS. Finnegan's invoices reflect time entries corresponding to an amount that exceeds $7,000,000.

Finnegan partner Scott Mosko declares that MPS gave him the invoices from FR and Latham, and Finnegan created a single Excel spreadsheet that includes the entries of each timekeeper from the

3

three law firms. This spreadsheet contains over 9,000 entries. Finnegan sorted these entries into seventeen categories of activities, separating out all entries relating to the ITC proceeding into a non-billable (NB) category. This category amounts to $1,890,197. Another category, labeled "Combination (C)," consists of block-billed entries for both the ITC and district court proceedings. This category amounts to $806,882. The fifteen other categories, listed on pages six and seven of MPS's motion, include activities such as, "Pleadings/Motions, Party Analysis and Meeting/Correspondence with Client, Case Strategy, Expert-Related Activities." To avoid double-billing, if a time entry was block-billed and covered two or more categories, the total amount was assigned to only one category.

## LEGAL STANDARD

In the Ninth Circuit, reasonable attorneys' fees are determined by first calculating the "lodestar." Jordan v. Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Morales v. City of San Rafael, 96 F.3d 359, 363 (9th Cir. 1996). There is a strong presumption that the lodestar figure represents a reasonable fee. Jordan, 815 F.2d at 1262. However, the court may adjust the award from the lodestar figure upon consideration of additional factors that may bear upon reasonableness. Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975).

4

DISCUSSION

I. General Objections

    A. Not Exceptional Under Section 285

02 Micro argues that this case is not exceptional under § 285 and, thus, attorneys' fees should not be awarded. This issue was previously litigated and decided in the March 3, 2011 Order. Therefore, this argument is a motion for reconsideration improperly brought in this proceeding for the determination of the amount of attorneys' fees to be awarded, and is denied.

    B. Disorganized Evidence

02 Micro argues that MPS's evidence is disorganized, making it difficult to respond to the fee request. The fact that MPS sorted and categorized the 9,000 billing entries made it easier to analyze the huge amount of documentation. 02 Micro has responded effectively. Thus, its argument that it could not respond is unpersuasive.

II. Reasonable Rate

    A. Legal Standard

Determining a reasonable hourly rate is a critical inquiry. Jordan, 815 F.2d at 1262. The fee applicant has the burden to produce evidence, other than the declarations of interested counsel, that the requested rates are in accordance with those prevailing in the community for attorneys of comparable skill and reputation. Id. at 1263. In establishing the reasonable hourly rate, the court may take into account: (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results

obtained. Cabrales v. County of Los Angeles, 864 F.2d 1454, 1464 (9th Cir. 1988). Other factors that can be considered are (1) the time and labor required; (2) the preclusion of other employment by the attorney due to acceptance of the case; (3) time limitations; (4) the amount involved and the results obtained; (5) the "undesirability" of the case; and (6) awards in similar cases. Hensley v. Eckerhart, 461 U.S. 424, 430 n.3 (1983). These factors are subsumed in the initial lodestar calculation, and should not serve as independent bases for adjusting fee awards. Morales, 96 F.3d at 363-64.

B. Discussion

A list of the rates for each timekeeper from Latham and Finnegan for 2009 and 2010 was filed under seal. To support the reasonableness of the attorneys' rates, MPS submits three different surveys of hourly rates charged by law firms, which were undertaken by the American Intellectual Property Law Association (AIPLA), the National Law Journal (NLJ) and PricewaterhouseCoopers.

The AIPLA survey indicates that, for 2008 in San Francisco, partners' median rate was $578 and the "third quartile" rate was $660; nationally, the median partners' rate in large firms was $598 and the "third quartile" rate was $696.[3] The rates in the surveys generally support the partners' rates. See View Engineering, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 987-88 (Fed. Cir. 2000) (approving reasonable rates based on AIPLA survey).

---

[3]The NLJ and PricewaterhouseCoopers surveys were filed under seal. However, they support a finding that MPS's requested rates are reasonable.

6

The AIPLA survey shows that, in 2008 in the San Francisco Bay Area, associates were billed at a median hourly rate of $338, an average hourly rate of $366 and a "third quartile" rate of $488. The AIPLA and NLJ surveys support the associates' billing rates requested here.

02 Micro does not address these surveys, but cites two recent cases from this district in which fees were awarded based on rates of $650 for partners, $500 for associates and $150 for paralegals in the San Francisco Bay Area. See Suzuki v. Hitachi Global Storage Techs., 2011 WL 956896, *4 (N.D. Cal.); Faiqman v. AT&T Mobility LLC, 2011 WL 672648, *5 (N.D. Cal.). The rates awarded in these cases generally support the rates requested by MPS.

02 Micro argues that, in cases where the attorneys' fees are high, such as here, the market requires the attorneys to discount their rates. 02 Micro acknowledges that the attorneys have already discounted the requested rates by ten percent and argues that a further discount of twenty percent is warranted. 02 Micro disputes MPS's claim that, if the attorneys had not been working on this case, they would have been working on other full-fee paying matters and, in support, submits articles from the legal press indicating that this case was litigated during a deep economic recession which adversely affected the legal profession.

Given the large attorneys' fees award requested in this case and the fact that the litigation took place during a severe economic recession, the Court agrees that the market would require a discount. The Court finds that the rates should be discounted by the ten percent that Latham, Finnegan and FR negotiated with MPS

7

and understands that the attorneys' fees requested have been discounted by this amount. If MPS's attorneys' fees request does not incorporate a ten percent discount, it shall so inform the Court.

III. Reasonable Hours

    A. Legal Standard

In calculating a reasonable number of hours, attorneys must justify their claim by submitting detailed time records. The court may adjust the hours downward if the documentation is inadequate, or the hours are duplicative, excessive or unnecessary. Chalmers, 796 F.2d at 1210.

    B. Limit Award to Actual Fees Paid

02 Micro points out that Finnegan agreed to a $4,000,000 fee cap and that, since March 2009, MPS has not paid fees to Finnegan beyond that cap. 02 Micro argues that it should not have to reimburse MPS on account of Finnegan's fees for more than $4,000,000, plus pre-March 2009 fees MPS paid to Finnegan, because it would be reimbursing MPS for fees it never paid. MPS responds that the fee agreements were negotiated early in the case when MPS and Finnegan did not know that 02 Micro would undertake acts that would prolong the litigation and unreasonably increase attorneys' fees. MPS indicates that, after it became clear that more work would be necessary than MPS and Finnegan had contemplated, they agreed to renegotiate the fee arrangement. MPS cites Junker v. Eddings, 396 F.3d 1359, 1365 (Fed. Cir. 2005), which stated:

> Although the amount the client paid the attorney is one factor for the court to consider in determining a reasonable fee, it does not establish an absolute

8

ceiling. The determination of a reasonable attorney fee requires the court to consider all relevant circumstances in a particular case.

02 Micro's argument is persuasive. Although MPS may have agreed to renegotiate the fee agreement with Finnegan, this has not occurred. The possibility that the fee agreement will be renegotiated after the Court issues its order is not relevant to this analysis. It is undisputed that, from March 2009 to the present, Finnegan has received a fee of $4,000,000 in accordance with the fee cap agreement. It would be inequitable to require 02 Micro to pay MPS millions more in fees than MPS paid to Finnegan. Therefore, the Court disallows fees requested for Finnegan's work above $4,000,000 after March 2009.

02 Micro also argues that recovery for all attorneys' fees should be capped at $4,000,000 because the billing records intermingle the work of Latham and Finnegan so it is not possible to separate the work done by Finnegan from the work done by Latham. This last argument is not well-taken because MPS' chart of attorneys' hours worked shows the hours worked by attorneys at each law firm.

C. Fish and Richardson Legal Fees

Although MPS requests fees on behalf of FR, it does not indicate the amount of this request. In its opposition, 02 Micro identifies from MPS' billing records a total of $281,162 in billing entries by FR and argues that MPS should not be awarded any of this amount because FR's work has not been adequately documented and because FR was ethically barred from representing MPS.

MPS argues that it has adequately documented FR's work

9

because it has listed the time entries for FR's attorneys in Exhibit A to the Mosko Declaration, from which 02 Micro has identified FR's total time entries. The Court finds the time entries to be sufficient documentation. Also, 02 Micro presents no evidence that FR was ethically barred from representing MPS.

Accordingly, no reduction of the fees MPS paid to FR is warranted.

D. Fees Must Be Caused By or Traced To Exceptional Behavior

02 Micro cites <u>Beckman Instruments, Inc. v. LKB Produkter AB</u>, 892 F.2d 1547, 1552 (Fed. Cir. 1989), for the proposition that there should be a close nexus between the alleged misconduct and the fees awarded. 02 Micro points out that the Court's vexatious litigation finding flowed from the fact that 02 Micro covenanted not to sue after substantial litigation had taken place. Based on this, 02 Micro argues that the attorneys' fees awarded should be limited to those incurred after the day it realized that defeat was inevitable and before the day it actually granted the covenants not to sue. 02 Micro argues that it became aware of the inevitability of its defeat when it received the Court's expert's report on June 14, 2010 and, on June 18, 2010, it decided not to proceed with the case. According to 02 Micro, this should limit the attorneys' fees award to those incurred during the five days from June 14 to June 18, 2010, which it calculates to be $191,595.

<u>Beckman</u> explained that the purpose of awarding attorneys' fees under § 285 is to discourage infringement by penalizing the infringer and to prevent gross injustice when the infringer has litigated in bad faith. <u>Id.</u> It also explained that only a few

10

cases have awarded attorneys' fees solely on the basis of litigation misconduct, without a concurrent finding of willful infringement. Id. at 1552-53. Where there is no willful infringement, the penalty imposed must be related to the bad faith and misconduct. Id.

The Court found in the March 3, 2011 Order that 02 Micro's misconduct was pervasive throughout the entire case, and an award of fees for the entire case is appropriate. 02 Micro's argument otherwise is unpersuasive.[4]

E. Limit Award to 02 Micro's Expert's Damages Estimate

02 Micro argues that the attorneys' fees award should be limited to the amount in controversy, which it defines as its expert's estimate of $4,398,551 in damages through August 31, 2009. 02 Micro argues that an award that is three times the damages amount is unreasonable, but provides no authority for this argument.

MPS points out that 02 Micro's expert stated that he expected to update his damages estimate through the date of the trial, as new data became available. MPS also points out that the damages estimate was faulty because it did not account for MPS's entire revenue stream for the accused products, which could be $430,000,000 over the lifetime of the patent.

---

[4] 02 Micro submits, as recent authority, Fox v. Vice, 131 S. Ct. 2205 (2011), in which the Supreme Court held that, when a plaintiff's civil rights suit involves both frivolous and non-frivolous claims, reasonable attorneys' fees may be awarded to the defendant under 42 U.S.C. § 1988, but only for fees that the defendant would not have incurred but for the frivolous claims. This case is inapplicable; the issue here is not frivolous versus non-frivolous claims.

02 Micro's argument for the limitation of fees on the basis of its estimated damages is unpersuasive.

F. Objections to Specific Time Entries

02 Micro objects to time entries totaling $4,227,314 of the original $13,290,092 fee request. It submits a chart showing the amount of fees related to each objection. Lydon Dec., Ex. N. As stated previously, based on 02 Micro's objections, MPS reduced its fee request to $11,519,987. The Court will address the objections that remain in dispute.

1. ITC and Domestic-Industry-Related Entries

In its original fee request, MPS created two categories related to the ITC litigation. Category "C," standing for "Combination," in the amount of $806,882, consisted of ITC and district-court-related entries that were block-billed together. Category 17, in the amount of $1,890,197, consisted of entries solely related to the ITC litigation, and was not included in the fee request. MPS proposed that it be reimbursed for fifty percent of the amount in Category "C," which would be $403,441. MPS acknowledged that this was an arbitrary amount because it could not ascertain what percentage of the block-billed entries was devoted to the district court litigation.

02 Micro has gone through MPS's billing entries and, in addition to the entries MPS originally included in Category 17 and Category "C," has identified $2,853,490 in purportedly non-recoverable billings directed at the ITC and domestic-industry-related proceedings. MPS responds that 02 Micro has double-counted some entries and, excluding the double-counting, $2,175,944 is in

12

dispute. Nevertheless, MPS concedes that 02 Micro's objection is valid and has created a spreadsheet of entries to which 02 Micro objected. This spreadsheet, labeled Exhibit 22, includes three categories: (1) entries for which full compensation is appropriate because none of the activities are related to the ITC proceeding, amounting to $218,034; (2) a second category "C" with combined entries totaling $967,960, of which MPS requests fifty percent reimbursement; and (3) ITC-only entries in the amount of $989,950 for which the compensation request is withdrawn.

The Court accepts MPS' characterization of the three categories and the amount of attorneys' fees in each category. The Court awards one hundred percent of the $218,034 in the first category, where attorneys did not undertake ITC-related work, and twenty-five percent of the $1,860,768 total amount in category "C." Thus, $465,192 is awarded for the entries in category "C." The Court awards a lower percentage for category "C" than the fifty percent suggested by MPS because the entries are improperly block-billed, MPS acknowledges that it does not know how much of the block-billed amounts were incurred in litigating this case and MPS did not itself identify in its motion all of the improperly block-billed entries, which required 02 Micro to comb through the 9,000 billing entries to identify all of the improper entries.

2. Lawsuit Against Professor Mercer

02 Micro objects to the inclusion of hours for work done on a lawsuit against Professor Ray Mercer. MPS concedes the point and has placed all the entries 02 Micro has identified as Mercer-related in a separate spreadsheet labeled Exhibit 23, which

13

contains three categories: (1) entries for which full compensation is appropriate because none of the activities are related to the Mercer lawsuit, amounting to $5,092; (2) block-billed entries totaling $85,962, which contain some activities related to the Mercer lawsuit and which MPS has added to category "C;" and (3) entries which only relate to the Mercer lawsuit, totaling $141,813, for which MPS withdraws its request for reimbursement.

The Court accepts MPS' characterization of the three categories and the amount of attorneys' fees in each category. The Court awards one hundred percent of the $5,092 in the first category, where attorneys did not undertake Mercer-related work. As in the previous section, the Court awards twenty-five percent of the block-billed entries in category "C."

### 3. ITC Discovery

MPS points out that, although O2 Micro created a category consisting of $341,100 in billings for time spent on ITC discovery before the Court allowed the parties to use ITC discovery in this case, it did not object to this category in its opposition. Because O2 Micro did not object to time spent on this category, no reduction of fees is required.

### 4. Fees Generated Since O2 Micro Filed Motion to Dismiss

O2 Micro argues that, as of June 19, 2010, when it filed its motion to dismiss, all issues were resolved with the exception of attorneys' fees and expenses. O2 Micro argues that the fees requested for this time period, which it quantifies as $432,808, should be discounted by fifty percent because litigating attorneys' fees does not require the same level of expertise as litigating

14

1 intellectual property disputes. 02 Micro cites <u>Gates v. Rowland</u>,
2 39 F.3d 1439, 1449 (9th Cir. 1994), where the Ninth Circuit
3 affirmed the district court's decision to award Sacramento rates
4 instead of San Francisco rates for fees litigating the amount of
5 attorneys' fees because "the justification of complex, specialized
6 knowledge and experience did not apply."

7 MPS argues that, after 02 Micro filed its motion to dismiss,
8 counsel were required to undertake numerous activities not related
9 to seeking attorneys' fees. It points out that the Court did not
10 immediately rule on the motion to dismiss, so both sides continued
11 preparing for trial.

12 02 Micro's argument is not persuasive and requires no fee
13 reduction.

### 5. Expert Fees

15 MPS requests payment of its expert witness fees in the amount
16 of $269,150, arguing that expert fees should be included in the
17 attorneys' fees award based upon the Court's findings that 02
18 Micro's behavior throughout the litigation was vexatious. 02 Micro
19 cites <u>Amsted Indus., Inc. v. Buckeye Steel Castings Co.</u>, 23 F.3d
20 374, 378-79 (Fed. Cir. 1994), to support its argument that recovery
21 of expert witness fees requires a level of misconduct not present
22 in this case.

23 Section 285 does not authorize the award of expert witness
24 fees. <u>Id.</u> Courts may award expert witness fees under 28 U.S.C.
25 § 1920, within the incorporated limits of 28 U.S.C. § 1821(b). <u>Id.</u>
26 Section 1821(b) provides that a witness shall be paid an attendance
27 fee of forty dollars per day for each day's attendance and for the

15

time going to and returning from the place of attendance plus a subsistence allowance when an overnight stay is required. Courts may also award expert witness fees under their inherent power to impose sanctions for bad faith and vexatious conduct. Id. at 378. "Without a finding of fraud or bad faith whereby the 'very temple of justice has been defiled,' a court enjoys no discretion to employ inherent powers to impose sanctions." Id. A court should resort to its inherent power to sanction only where the rules or statutes do not reach the acts which degrade the judicial system. Id.

The high attorneys' fees award under § 285 sufficiently addresses 02 Micro's litigation misconduct. Therefore, the request for expert witness fees is denied.

IV. Costs

02 Micro has not objected to the non-taxable costs requested. Therefore, the Court awards $663,151 in non-taxable costs.

V. Leave to File Fee Application for Preparing This Fee Request

The Court grants MPS leave to file a second fee application for the work entailed in the preparation of the instant fee application and reply to 02 Micro's opposition.

CONCLUSION

For the foregoing reasons, MPS' request for non-taxable costs is granted in the amount of $663,151 and its request for expert fees is denied. The attorneys' fees request is to be recalculated by MPS in accordance with this order. The revised calculation is due no later than two weeks from the date of this Order. If 02 Micro believes the calculation is incorrect, it may file its

16

calculation one week thereafter and MPS may file a reply one week later.

    IT IS SO ORDERED.

Dated: 1/17/2012

CLAUDIA WILKEN
United States District Judge